*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CONNIE KUHN and KUHN'S YARD & GARDEN CARE, INC.,

UNPUBLISHED
December 11, 2025
11:09 AM

Plaintiffs/Counterdefendants-
Appellees,

v

No. 374038
Kalamazoo Circuit Court
LC No. 2023-000546-CB

MEINTS AUTOMOTIVE REPAIR, INC., doing business as AUTO TECH REPAIR CENTER, and JOSEPH MEINTS,

Defendants/Counterplaintiffs-
Appellants.

Before: M. J. KELLY, P.J., and REDFORD and FEENEY, JJ.

PER CURIAM.

Defendants/crossplaintiffs-appellants, Joseph Meints and Meints Automotive Repair, Inc, doing business as Auto Tech Repair Center, appeal as of right the trial court's judgment following a bench trial. This action stems from plaintiffs/crossdefendants-appellees, Connie Kuhn and Kuhn's Yard & Garden Care, Inc's, claims against defendants for taking a personal vehicle and heavy business equipment and refusing to return them. In return, defendants counterclaimed for breach of contract against plaintiffs, alleging the parties entered into a contract wherein defendant made necessary repairs to the personal truck and heavy business equipment and plaintiffs failed to pay for those repairs. After a bench trial, the trial court ordered the return of all vehicles and equipment in defendants' possession to plaintiffs and ordered plaintiffs to pay defendants $7,766.82 for repairs made to a bulldozer and excavator. The trial court denied defendants' counterclaims for repairs made to other vehicles and equipment and denied defendants damages for parts purchased for these repairs. We affirm.

# I. BASIC FACTS

Connie Kuhn[1] owned and operated a landscaping business, Kuhn's Yard & Garden Care, with her husband, Michael Kuhn, until his death in 2021. Following his death, Connie continued to operate the business with her grandson, Michael Kaden Kuhn, Sr., as her primary employee. In June 2022, Joseph Meints, owner of Meints Automotive Repair, approached Connie to offer a barter. In exchange for personal use of a Caterpillar bulldozer and excavator owned by Kuhn's Yard & Garden Care, Joseph would perform routine repairs and maintenance to the equipment while it was in his possession. Connie agreed to this exchange, and her grandson Kaden took this equipment to Joseph. In June 2022, Joseph was also hired to repair Connie's personal vehicle, a Silverado truck, that was in an accident while Kaden was driving it. Connie's insurer paid Joseph over $18,000 to repair the truck.

In March 2023, Connie asked Kaden to retrieve the vehicles and equipment from Joseph's shop. Kaden failed to do so, claiming that work on the vehicles and equipment was not finished. In April 2023, at the request of Connie, Kaden took a Freightliner dump truck and trailer owned by Kuhn's Yard & Garden Care to retrieve the bulldozer and excavator from Joseph. Rather than retrieve the equipment, he left the Freightliner and trailer at Joseph's personal residence. In June 2023, Connie terminated her grandson's employment and obtained a personal protection order (PPO) against him after noticing that additional equipment was missing from her business.

In July 2023, Connie approached Joseph to request the return of her Silverado truck and equipment. Joseph refused to release the truck or any of the other equipment, claiming that she had outstanding payments of over $40,000 for repairs to the Silverado truck and business equipment. Subsequently, Connie filed a complaint against defendants with the Michigan Attorney General's Office and reported her vehicle stolen. In August 2023, Connie visited Joseph's personal residence, where he was keeping the vehicles and equipment, with a police officer and demanded the return of her property. Joseph refused and sought a garage keeper's lien on the vehicles and equipment. Thereafter, he held an auction in which he was the only bidder and acquired ownership of the Silverado truck, Freightliner, and trailer.

In September 2023, plaintiffs filed this action against defendants for the wrongful retention of their vehicles and equipment. In turn, defendants counterclaimed for breach of contract, alleging that plaintiffs owed money for the repairs performed on these vehicles. At trial, Joseph testified that Kaden brought the vehicles and equipment to his shop and signed off on the repairs. Joseph testified that he believed Kaden was part-owner of Kuhn's Yard & Garden Care and could agree to the repairs on behalf of the business. In return, Connie testified that Kaden did not own the business and was not authorized to enter contracts on its behalf. Connie testified that, other than basic repairs to the bulldozer and excavator, she had no idea about the unauthorized repairs and did not consent to them.

The trial court issued an opinion from the bench. The trial court held that Kaden was plaintiffs' agent and he was authorized to enter the contracts for the bulldozer and excavator, but

---

[1] Because several individuals relevant to this case share first and last names, we refer to these individuals by their first names.

he had neither actual nor apparent authority to enter the repair contracts for the Silverado truck, Freightliner, and trailer. The trial court further held that the only repairs performed on the Silverado truck were those already paid for by the insurer and that defendants had failed to present evidence of damages for parts bought from external suppliers for the claimed repairs. After making these findings, the trial court ordered defendants to return all of the vehicles and equipment to plaintiffs and ordered plaintiffs to pay defendants $7,766 for repairs to the bulldozer and excavator after deducting $15,000 off of the total for Joseph's personal use of the equipment. This appeal follows.

## II. STANDARD OF REVIEW

This Court reviews a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. *Astemborski v Manetta*, 341 Mich App 190, 196; 988 NW2d 857 (2022). "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made. This Court is especially deferential to the trial court's superior ability to judge the relative credibility of witnesses[.]" *Id*. (quotation marks and citation omitted).

## III. THE REPAIR CONTRACTS

Defendants first argue that the trial court erred by denying their breach-of-contract counterclaims in relation to the Silverado truck, Freightliner, and trailer and erred by denying defendants damages for parts purchased because Kaden was authorized to enter the repair agreements on behalf of plaintiffs. We disagree.

Defendants' arguments on appeal focus on whether Kaden had actual or apparent authority to bind plaintiffs to the repair agreements for the Silverado truck, Freightliner, and trailer. However, as an initial matter, the trial court did not solely rely on Kaden's lack of authority to enter these agreements when issuing its holding. The trial court held that the repairs defendants claimed to have made to the Silverado truck did not occur, and that defendants presented no evidence of damages for parts bought from external suppliers for use in the repairs to any of the vehicles or equipment. These findings were not clearly erroneous.

At trial, defendants claimed that, in addition to the repairs to the Silverado truck plaintiffs' insurer paid defendants $18,017 to perform, defendants performed an additional $9,893 in repairs both before and after the accident that went unpaid. Joseph testified that, shortly before the accident, he had possession of the Silverado truck and made repairs for issues with the starter and transmission and replaced the tires. He claimed that he gave the truck back to Kaden before the accident while he waited to receive parts necessary to finish the repairs. The trial court held that defendants' claims that they performed additional repairs to the Silverado truck concurrent with the $18,017 worth of repairs were simply not credible. This was a bench trial, and the trial court was in the best position to judge the credibility of the witnesses before it. See *id*.

Moreover, evidence was presented from which the trial court could conclude these repairs did not occur. Connie bought the Silverado truck in February 2022 with 175,000 miles on its odometer. From March through June 2022, Kaden used the truck for the company until he was in an accident. At the time of the accident, the vehicle had 190,765 miles on it. From this evidence,

the trial court reasonably inferred that the vehicle would not have accrued another 15,000 miles if it were sitting in Joseph's shop for repairs before the accident. Additionally, defendants failed to present any evidence of an invoice for the repairs made before the accident. Once the vehicle was towed to defendants after the accident, it was never returned to Connie. Starting in June 2022, the Silverado truck was solely in defendants' possession for over a year. During that time, Connie never received an invoice indicating that she owed money for these additional repairs and was never notified that the truck was ready to be picked up. Connie testified that she stopped in and asked if defendants were done repairing the truck from the accident several times and was told that issues purchasing parts during the COVID-19 pandemic delayed the repairs. Collectively, this evidence supported that these additional repairs did not occur. The trial court did not clearly err by finding that defendants did not perform the additional $9,893 in repairs to the Silverado truck. Consequently, for reasons separate from any agency relationship between Connie and Kaden, defendants were not entitled to relief in relation to the Silverado truck.

Additionally, defendants challenge the trial court's decision not to award damages for parts purchased from external suppliers to repair any of the vehicles, including the bulldozer and excavator. Again, separate from its decision that Kaden lacked the authority to enter the repair agreements for the Silverado truck, Freightliner, and trailer, the trial court did not award any damages for parts bought from external suppliers because defendants presented no evidence that they purchased these parts. This holding was supported by the record evidence. When asked at trial why he did not produce any receipts for these parts, Joseph testified that he had receipts, but did not produce them for trial. The trial court noted that defendants could have easily obtained these records from the suppliers before trial. Plainly, the trial court did not find Joseph's testimony that he bought parts for the repairs credible without other evidence to verify his assertions.[2] See *id*. The trial court did not err by denying damages for these parts.

Next, addressing defendants' agency arguments, the record supported the trial court's holding that Kaden had neither actual nor apparent authority to bind Kuhn's Yard & Garden Care to the repair agreements for the Silverado truck, Freightliner, or trailer. Recently, this Court summarized the basic tenants of agency law:

> Under fundamental agency law, a principal is bound by an agent's actions within the agent's actual or apparent authority. The authority of an agent to bind a principal may be either actual or apparent. Actual authority may be express or implied. Implied authority is the authority which an agent believes he possesses. Implied authority consists of the power to do all things which are reasonably

---

[2] Defendants argue that verification of parts bought were not introduced at trial because plaintiffs did not timely request documentation of parts bought from external suppliers during discovery. Defendants bore the burden of establishing their breach-of-contract counterclaim, including their damages. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003) ("The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach."). That plaintiffs may have failed to timely request such documents during discovery does not negate that defendants failed to present evidence of their own claimed damages.

necessary or proper to efficiently carry into effect the power conferred, unless it be a thing specifically forbidden. Whether the act in question is within the authority granted depends upon the act's usual or necessary connection to accomplishing the purpose of the agency. Implied authority is not without limits: The apparent or implied authority of an agent cannot be so extended as to permit him to depart from the usual manner of accomplishing what he is employed to effect. Nor can he enlarge his powers by unauthorized representations and promises. An implied agency cannot exist contrary to the express intention of an alleged principal although it may spring from acts and circumstances permitted by the principal over a course of time through acquiescence.

Actual authority of an agent may be implied from the circumstances surrounding the transaction at issue. These circumstances must show that the principal actually intended the agent to possess the authority to enter into the transaction on behalf of the principal. Apparent authority arises where the acts and appearances lead a third person reasonably to believe that an agency relationship exists. However, apparent authority must be traceable to the principal and cannot be established only by the acts and conduct of the agent. Whether an agent possessed apparent authority to perform a specific act requires the court to review all surrounding facts and circumstances and determine whether an ordinarily prudent person in the relevant business would be justified in assuming that the agent had authority to act on behalf of the principal as alleged. [*DBD Kazoo LLC v Western Mich LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 361299); slip op at 6 (quotation marks and citation omitted).]

In this case, the trial court concluded that Kaden was plaintiffs' agent, but that the scope of his authority did not include the ability to enter the repair contracts for the Silverado truck, Freightliner, and trailer. At trial, Kaden testified that his grandparents told him he was a 49% co-owner of Kuhn's Yard & Garden Center and that he only needed to fill out paperwork at the township to make his position official; however, he never went to the township to complete the paperwork. The trial court found this testimony incredible and determined that Kaden was neither the owner nor believed he was the owner of Kuhn's Yard & Garden Center, such that he was not acting upon his own authority when he entered the repair agreements. See *Astemborski*, 341 Mich App at 196.

Instead, the record evidence demonstrated that Kaden was plaintiffs' primary employee. He performed landscaping jobs on behalf of the company. However, in the course of performing his work, he did not pay bills or write checks on behalf of the business. Kaden had a company credit card which he used to purchase fuel for the vehicles and equipment and to purchase job-related tools. Kaden acknowledged that before making expensive purchases on the company credit card, he would call Connie to ensure sufficient funds were in the account. Despite this, he did not call Connie before he entered multiple repair contracts with defendants for thousands of dollars for the vehicles and equipment. This evidence demonstrated that Kaden was plaintiffs' agent. However, an agent's authority is not without limits. See *DBD Kazoo LLC*, ___ Mich App at ___; slip op at 6. Kaden had neither express nor implied authority to enter agreements to repair the vehicles and equipment.

The record evidence shows that plaintiffs did not expressly authorize Kaden to take the Silverado truck, Freightliner, or trailer to defendants for repairs beyond those that were performed on the Silverado truck stemming from the accident. Connie testified that she was never informed about additional repairs to the Silverado truck, and she never saw estimates or invoices for any of the vehicles and equipment. In fact, when Kaden took the Freightliner and trailer to defendants in April 2023, Connie had already asked Kaden to retrieve the Silverado truck, bulldozer, and excavator from defendants. Kaden took the Freightliner and trailer to defendants under Connie's direction to use them to retrieve the bulldozer and excavator. Rather than return with the bulldozer and excavator, Kaden left the Freightliner and trailer with defendants. This was an act in direct contravention to Connie's express wishes to use the Freightliner and trailer to secure the return of the bulldozer and excavator from defendants. See *id.* This evidence supported that Kaden was not expressly authorized to enter the repair agreements.

The trial court also reasonably inferred that Kaden did not have implied authority to enter into the repair agreements for the Silverado truck, Freightliner, and trailer. As noted, implied authority is the authority an agent believes he has, but that authority cannot be so extended as to permit him to depart from the usual manner of accomplishing what he is employed to effect. See *id.* The record evidence showed that in the normal course of his employment, Kaden did not issue payments on behalf of the business and generally called Connie before making expensive purchases on his company credit card. However, when he took the vehicles and equipment to defendants for repairs, he made no effort to inform Connie he was entering agreements for plaintiffs to pay thousands of dollars of repairs to the vehicles and equipment. In contrast, when Kaden previously brought the bulldozer and excavator to defendants, he delivered that vehicle and equipment at the direction of Connie and with the knowledge that Connie had entered a barter agreement with defendants. See *id.* Kaden acted beyond the typical scope of his duties when he sought repairs for the vehicles and equipment without Connie's permission.

Record evidence also indicated that at the time Kaden took the Freightliner and trailer to defendants, his working relationship with Connie was deteriorating and he may have been motivated by animosity toward Connie to enter into the repair agreements rather than a belief that he had the authority to enter the contracts. Connie noticed that other equipment, such as a T200 Bobcat, had gone missing from the business in Spring 2023. Two months after Kaden delivered the Freightliner and trailer to defendants, Connie fired Kaden and obtained a PPO against him. From this evidence, the trial court reasonably inferred that Kaden did not believe he had the authority the bind plaintiffs to the repair agreements and that he departed from the usual duties of his employment in doing so. See *id.* The record evidence shows that Connie did not give Kaden express or implied authority to enter these agreements on behalf of the business.

Second, the surrounding facts and circumstances also do not establish that Connie cloaked Kaden with apparent authority such that Joseph was justified in relying on Kaden to bind plaintiffs to the repair contracts. *Id.* At trial, Joseph testified that he relied on Kaden's representation to him that he owned Kuhn's Yard & Garden Care. As already noted, this representation was untrue. Regardless of its veracity, this representation stemmed only from Kaden. Connie did not tell Joseph that Kaden owned Kuhn's Yard & Garden Care. The acts and conduct of an agent are insufficient to establish apparent authority. *Id.* Instead, apparent authority must be traceable to the principal, and no evidence was presented at trial to trace the authority to enter the additional repair agreements back to Connie. *Id.*

The evidence at trial established that when defendants entered the repair agreements for the Silverado truck, Freightliner, and trailer, defendants interacted exclusively with Kaden. There was no record evidence that defendants spoke to plaintiffs about any of the additional vehicles and equipment. Joseph was unaware of any check Kaden had signed on behalf of the business before the repair agreements at issue, such that Joseph could not have relied on the parties' course of conduct in previous business transactions. The only conduct traceable to Connie was the barter agreement she entered with Joseph. Under that agreement, Joseph borrowed the bulldozer and excavator for personal use and performed basic maintenance on the equipment while it was in his possession. As part of that exchange, Connie bought parts for the bulldozer and excavator. The exchange defendants bartered for with Connie was limited to the bulldozer and excavator and limited in the scope of the repairs. This agreement alone did not justify defendants in assuming that Kaden had authority to enter the other repair agreements on different vehicles and equipment and beyond the scope of the repairs for basic maintenance. No other record evidence traceable back to Connie would have authorized the repairs. Therefore, Kaden's acts of entering the repair agreements were not within his apparent authority, and plaintiffs were not bound by them.

Finally, defendants argue plaintiffs failed to revoke Kaden's authority to enter the contracts. This argument is misplaced. "Generally, a principal may revoke the authority of his agent at any time, but the acts of an agent after his authority has been revoked may bind a principal as against third persons who, in the absence of notice of the revocation of the agent's authority, rely upon its continued existence." *LaFond v Rumler*, 226 Mich App 447, 458; 574 NW2d 40 (1997). Defendants argue that Connie could have taken steps to revoke Kaden's authority and she only acted to tell her grandson she disagreed with his actions. This argument fails because Kaden lacked either actual or apparent authority to enter the contracts. Connie was not required to revoke authority that Kaden lacked.

In conclusion, although Kaden was plaintiffs' agent, he had neither actual nor apparent authority to enter the repair contracts on behalf of plaintiffs. Plaintiffs were not aware of the repair contracts Kaden entered for the Silverado truck, Freightliner, or trailer, and did not authorize Kaden to enter them. Beyond that, the trial court made additional determinations that repairs to the Silverado truck did not occur and that defendants failed to establish damages for the purchase of parts from external suppliers. Therefore, the trial court did not err by determining that defendants were not entitled to damages for work performed on the Silverado truck, Freightliner, and trailer or for parts purchased for the repairs.

## IV. DEFENDANTS' GARAGE KEEPER'S LIEN

Next, defendants argue the trial court erred by finding that defendants did not comply with the Garage Keeper's Lien Act, MCL 570.301 *et seq*., and by ordering defendants to return the vehicles and equipment to plaintiffs. We disagree.

Under the Garage Keeper's Lien Act, a garage keeper may assert a lien for labor or material for storing, repairing, maintaining, or keeping a vehicle that went uncompensated. MCL 570.303.[3] The garage keeper may proceed to sell the vehicle if the lien remains unpaid and the lienholder complies with the procedural requirements set out in the statute. MCL 570.305. One of the statutory requirements is that the sale to foreclose upon a garage keeper's lien must be done by a public sale: "If charges described in [MCL 570.303] are not paid, the garage keeper may sell the vehicle at a public sale described in this section." MCL 570.305(2).

The statute does not expressly define the statutory phrase "public sale." However, the phrase has an unambiguous and obvious meaning. A public sale is a sale in which the public is invited to participate. This definition is supported by the dictionary definition of the term "public sale," which is "[a] sale made after public notice, such as an auction or sheriff's sale; specif., a sale to which the public has been invited by advertisement to appear and bid at auction for the items to be sold." *Black's Law Dictionary* (12th ed). A logical corollary of a "public sale" is that public participation is precluded when the lienholder did not provide the public notice before the sale.

In this case, the trial court found that the auction defendant held was a "farce" and "there was no basis for transferring titles." Specifically, the trial court determined that defendants notified plaintiffs of the auction, but took no action to notify the public. The trial court's factual finding is supported by the record evidence. Defendants did not advertise the sale in a public forum, such as the newspaper or Facebook  Consequently, there was no public notice of the sale, and a "public sale" did not occur. Instead, plaintiffs' vehicles and equipment were sold at a private auction, at which the only bidder was Joseph. This does not serve the purpose of holding a public sale. In addition to the lienholder recouping the balance of a debt, the purpose of a public sale in foreclosure proceedings is to sell the item for the highest possible price and lessen the potential abuse of the sale process. It is not apparent from the record how much defendant spent when he bought the vehicles from himself. However, the sale to himself without the opportunity for the public to participate in the bidding process supports the trial court's determination that the auction was a farce. Defendant did not comply with the statutory requirements in MCL 570.305.

Defendants finally contend that the trial court was without authority to void the title to the vehicles after the auction. Defendants argue that the Garage Keeper's Lien Act's exclusive remedy is monetary damages as listed in MCL 570.307, and that defendants otherwise complied with the statutory procedures to enforce a garage keeper's lien.[4] In support of this argument, defendants rely on the general proposition that "where a statute creates a new right or imposes a new duty not

_____

[3] The Garage Keeper's Lien Act applies only to titled vehicles that travel on highways. MCL 570.302(h) (incorporating the definition of "vehicle" from the Michigan Vehicle Code, MCL 257.79). Therefore, the bulldozer and excavator, which are not titled vehicles, were not subject to the Garage Keeper's Lien Act. The only items for which defendants could execute a lien were the Silverado truck, the Freightliner, and the trailer.

[4] The Garage Keeper's Lien Act provides that "[a]n owner or lienholder who suffers damages because of a garage keeper's failure to comply with this act may bring an action in a court of competent jurisdiction for the actual amount of the damages or $250.00, whichever is greater." MCL 570.307.

previously recognized under the common law, the remedies provided in the statute are presumed exclusive unless the remedies are plainly inadequate or there is a clear contrary intent." *Stegall v Resource Tech Corp*, 514 Mich 327, 343; 22 NW3d 410 (2024). This argument is without merit.

Defendants make no effort to explain what new right or duty is imposed by the Garage Keeper's Lien Act such that this general rule would be applicable. More significantly, defendants' argument ignores that he did not execute a valid lien on the Silverado truck, Freightliner, and trailer, and he did not hold a valid auction such that title to this equipment was properly transferred to Joseph.

Our Supreme Court has previously discussed this issue in a factually similar case. In *Joy Oil Co v Fruehauf Trailer Co*, 319 Mich 277, 279; 29 NW2d 691 (1947), the plaintiff, Joy Oil, leased two semitrailers to a company called Advance Petroleum Transport Company. The defendant, Fruehauf, made repairs to the semitrailers at the request of Advance Petroleum and executed a lien after those repairs went unpaid. *Id*. The trial court had determined that Advance Petroleum was not acting as Joy Oil's agent when it made the request for repairs, and there was no record evidence that Joy Oil knew of or consented to the repairs. *Id*. In affirming the trial court's judgment against the defendants, our Supreme Court explained that under the Garage Keeper's Lien Act, the burden of proving the lien rested on the party claiming it. *Id*. at 282. The Court held that the defendant did not have a garage keeper's lien because the plaintiff, the sole owner of the semitrailers, had not requested or consented to the repairs. *Id*. Under the Garage Keeper's Lien Act, a lien only arose when the services or materials were furnished at the request or with the consent of the owner. *Id*.

The *Joy Oil* Court's analysis is directly applicable to this case. The Garage Keeper's Lien Act still provides that a garage keeper has a lien only for services or materials furnished for a "vehicle at the request or with the consent of the owner of the vehicle." MCL 570.303(1). In this case, the repairs on the Silverado truck, Freightliner, and trailer were executed without Connie's knowledge or consent. Moreover, the trial court determined that the auction at which defendants sold these items to themselves was a farce. Defendants have offered no explanation why they should retain title to these vehicles and equipment when they did not execute a proper lien or properly transfer title in a public sale. The trial court acted within its equitable authority to return property plaintiffs rightfully owned and was retained without her consent.

Affirmed.

/s/ Michael J. Kelly
/s/ James Robert Redford
/s/ Kathleen A. Feeney